# In the United States Court of Federal Claims

No. 20-126

Filed: November 7, 2023

|   |
|---|
| **CHEYENNE RIVER SIOUX TRIBE,** <br><br>         *Plaintiff*, <br><br> v. <br><br> **UNITED STATES,** <br><br>         *Defendant*. |

*Steven J. Gunn*, Special Counsel to the Cheyenne River Sioux Tribe, with *Mark C. Van Norman*, of counsel, Rapid City, SD, for Plaintiff.

*Hannah E. O'Keefe*, Trial Attorney, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, with *Dondrae Maiden*, *Victoria A. Cejas*, *Shani N. Sumter*, and *Kristen D. Kokinos*, of counsel, Washington, D.C, for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

  While the words of the 1868 agreement between the Cheyenne River Sioux Tribe (the "Tribe") and the United States may have faded, they are not forgotten. This case is about a promise, and as with all old promises, the parties are at odds about how old words apply to new unforeseen circumstances.

  The Tribe argues that the United States' failure to repair deteriorating conditions of a building on its reservation ("the Building") is a violation of trust obligations, constitutes breach of contract, and amounts to a taking under the Fifth Amendment. The United States argues that despite the longstanding shared use of the Building, the United States never contracted with the Tribe to maintain the Building, did not owe a trust obligation to maintain it, or took any actions that could be characterized as a constitutional taking of the Tribe's property. While the Court finds that the Tribe's breach of contract claim fails, the Tribe's claims for breach of trust and takings are subject to genuine issues of material fact. Accordingly, the Court grants in part and denies in part the United States' motion for summary judgment.

I.  **Background**

On the corner of Main Street, between B Street and E Street, approximately 0.3 miles south of Highway 212, in Eagle Butte, South Dakota sits Building 2001. (*See* Amend. Compl. at 7, ¶28, ECF No. 13; Defendant's Mot. for Summ. J. ("Def.'s Mot.") Ex. 14 at 3, ECF No. 83-14).[1] Today, the Building sits empty, filled with debris, and desolate enough to resemble a haunted house. (*See* Def.'s Notice at 1, ¶1, ECF No. 105). Signs posted on the Building's entrances read: "Danger – Keep out. This structure is unsafe, and its use or occupancy is prohibited by the U.S. Department of the Interior. No Trespassing. This sign must not be removed." (*Id*. at 2, ¶2). But before the events leading to this lawsuit, the Building served an important purpose.



(Def.'s Mot. Ex. 16 at 9, ECF No. 83-16).

Stretching parallel to Main Street, the Building's north entrance ("BIA North") led to the Department of Interior's Cheyenne River Agency Offices. (Plaintiff's Resp. to Mot. for Summ. J. ("Pl.'s Resp.") Ex. U, ECF No. 96-21; *see also* July 27, 2023, Oral Argument Transcript ("OA Tr.") 27:2–19, ECF No. 107). The separate entrance from the south ("BIA South") led visitors to the Tribal offices, consisting of the tribal council chambers, the office of the tribal chairman, the tribal secretary, the tribal treasurer, and the legislative offices. (*Id*. 18:8–10; *see also* Pl.'s Resp.

---

[1] The Court conducted a site visit on July 27, 2023, to view the Building. (*See* ECF No. 105); *see also Marine Indus. Constr. v. United States*, 2021 U.S. Claims LEXIS 1657 *12 (Fed. Cl. July 23, 2021) ("When a court decides to conduct a site visit, it is 'free to make use of its observations, to the extent relevant, in its decision of the case.'") (citing *Ark. Game & Fish Comm'n. v. United States*, 736 F.3d 1364, 1380 (Fed. Cir. 2013)).

2

Ex. R at 2, ECF No. 96-18). The Department of the Army, Corps of Engineers constructed the Building in 1959. (Def.'s Mot. Ex. 16 at 14, ECF No. 83-16). The Tribe built an addition to the Building in 1977, referred to as the Tribal Addition or the Annex, which is attached to the western side of the Building. (Def.'s Mot. Ex. 18, ECF No. 83-18). Yet, the Building's existence is tied to events dating back another hundred years.



(Def.'s Mot. Ex. 17 at 2, ECF No. 83-17).

President Andrew Jackson and Congress, through the Treaty of Fort Laramie of 1868 (the "Treaty"), agreed to "set apart" stretches of land on the east bank of the Missouri River "for the absolute and undisturbed use and occupation," of different tribes of the Great Sioux Nation as a peace condition with that tribe. *See* Treaty Between the United States of America and different Tribes of Sioux Indians, 15 Stat. 635, 636 (Apr. 29, 1868).[2] Under Article IV of the Treaty, the United States agreed, "at its own proper expense to construct," on designated land "an agency building." *Id.* The Treaty manifested a purpose for the Building: to ensure "prompt and diligent

---

[2] *See also* Carla F. Fredericks & Jesse D. Heibel, *Standing Rock, the Sioux Treaties, and the Limits of the Supremacy Clause*, 89 U. COLO. L. REV. 477, 503 (2018) ("From around 1865 to 1868, the United States and Great Sioux Nation fought in the Powder River War, which was a series of battles in which the Sioux Tribes fought to protect the integrity of the Treaty lands against the incursion of white settlers and the construction of the Powder River Road").

3

inquiry" into "matters of complaint" by and against the tribe as it pertained to the enforcement of the Treaty and for the "faithful discharge of other duties," assigned to the United States' agent for the tribe. *See* art. V. As the parties understand, the Agent refers to the United States' "liaison" in tribal affairs, which today is the Department of Interior, Bureau of Indian Affairs' ("BIA") Agency Superintendent. (Def.'s Mot. at 12). The United States established the Cheyenne River Agency ("the Agency") within the Great Sioux Reservation in 1869 and constructed the first building to house the Agency. (Pl.'s Mot. Ex. A at 5, ECF No. 96-1).

In 1889, Congress enacted legislation that divided the Great Sioux Nation and established separate reservations for Sioux bands; the Cheyenne River Sioux Tribe subsequently relocated alongside the Missouri River. (Pl.'s Resp. at 14). By proclamation from President Benjamin Harrison, the Agency Building took the same route, with the United States reconstructing what is now referred to as the Old Agency Building fifty-six miles northward along the Missouri River. (*Id.*) The Old Agency Building was built on tribal land held in agency-reserved status. (Pl.'s Resp. Ex. A at 5).

In 1934, the Indian Reorganization Act ("IRA") vested in the tribes the power to oversee and participate in the "sale, disposition, lease or encumbrance of tribal lands." 48 Stat. 984 (June 18, 1934) (codified as amended at 25 U.S.C. § 5101 *et seq.*). As a tribe organized under section 16 of the IRA, the Cheyenne River Sioux Tribe's constitution and by-laws were approved by the Secretary of Interior and became binding on the United States. 25 U.S.C. § 5123(d).

The Old Agency Building remained in the new location until 1944 when Congress's authorization to construct the Oahe Dam caused the area to be flooded, forcing the Tribe to relocate yet again.[3] *See* Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887; 33 U.S.C. § 701-1 *et seq.* Under the Cheyenne River Oahe Act of 1954, the United States agreed to purchase the tribal land around the area where it planned to build the dam and pay for relocating and reestablishing the Tribe in South Dakota. Cheyenne River-Oahe Act ("Oahe Act"), Pub. L. 83-776, 68 Stat. 1191, § 4 (Sept. 3, 1954). The Oahe Act also included express language addressing the status of the Building, providing that further appropriation "shall be expanded for the relocation and reconstruction of Cheyenne River Agency." *Id.* The law directed the United States to pay $5,384,014 in just compensation to the Tribe for more than 100,000 acres of land. *See* § 2; (Pl.'s Resp. at 7). The Oahe Act also mandated that funding the "complete rehabilitation" of the Tribe shall be done with the aim of restoring the Tribe "to a condition not less advantageous," than one existing at the time. § 5. Subsequently, a report prepared by the Army Corps of Engineers proposed Eagle Butte, South Dakota as the new location for the Agency. (Pl.'s Resp. Ex. J, ECF No. 96-10).

As the Tribe and the United States continued to flesh out the details of relocation, a disagreement emerged as to the exact site for constructing the new Agency Building. (*See* Pl.'s Resp. Ex. L, ECF No. 96-12). The Tribe expressed its intention to have the new Agency

---

[3] Lake Oahe is a large, man-made lake "stretching 230 miles from Pierre, South Dakota to Bismarck, North Dakota." United States Army Corps of Engineers, Oahe Dam, https://www.nwo.usace.army.mil/Missions/Dam-and-Lake-Projects/Missouri-River-Dams/Oahe/ (last visited Oct. 30, 2023).

Building sit completely on Tribal land (i.e., land held in trust by the United States). (*Id.*). Conversely, the BIA desired to construct the Building on U.S.-owned land. (*See* Pl.'s Resp. Ex. M, ECF No. 96-13). In 1957, the Tribe and the BIA resolved this issue by adopting the Tribe's preferred site. (Def.'s Mot. Ex. 10, ECF No. 83-10). BIA letters indicate that the decision to place the Building on tribal land was reached after the Attorney General of South Dakota assured the United States that the city of Eagle Butte would be able to provide water and sewage services and would refrain from assuming jurisdiction over law enforcement issues even if the Building sits on Tribal land. (*Id.*).

The Tribe then adopted a resolution on April 20, 1960 ("the Tribal Resolution"), that requested the Secretary of Interior's approval for setting aside the designated tribal land to construct the Agency Building; the tribal resolution noted that "the following conditions" were "applicable":

> 1. That the land will be held in Agency Reserve status as the present former agency site is now held.
>
> 2. That all building and facilities of any nature which are constructed on, or moved to, the said tract of land will revert to tribal ownership when the Government no longer has need for them for Agency purposes in accordance with the statement of Commissioner of Indian Affairs in a letter dated December 18, 1956.
>
> . . . .

(Def.'s Mot. Ex. 14 at 3, ECF No. 83-14).

The BIA Commissioner approved the resolution; and to begin construction on the site recommended by the Tribe, the United States purchased portions of the underlying land at the proposed site that were not already owned held in trust, putting those portions in administrative reserve as well. (Pl.'s Resp. Ex. Q, ECF No. 96-17).[4] The United States proceeded to construct what became known as Building 2001 at the cost of $351,149.88. (Def.'s Mot. Ex. 16 at 51).

And then, it began to rain.

By the mid-1970s, South Dakota's severe winters caused numerous structural damages that demanded frequent maintenance and repair. (*See* Def.'s Mot. Ex. 16 at 7, ECF No. 83-16). Weather-induced damage impacted all three areas of the Building. (Def.'s Mot. at 17–18). Not the least of these issues was frequent roof leaks. (*See id.* (noting that contractors recommended addressing the roof leaks as early as 1979)).

The United States undertook "countless maintenance and repair projects" throughout the years, including, on at least one occasion, replacing the roof over BIA North and Tribal South, while the Tribe undertook repairs and maintenance for the Tribal Annex. (*Id.*). At the inception

---

[4] The BIA Commissioner's letter of approval did not address the Tribe's contention about right of reversion in the Building. (*See* Pl.'s Resp. Ex. Q, ECF No. 96-17).

of the Building's co-occupancy, the Tribe and the United States executed a "use permit" to grant the Tribe permission to use the Tribal South area; and this permit reflects the same division of responsibilities: BIA will be responsible for "maintenance and repair" while the Tribe will pay for utilities and other costs associated with Tribal operations. (Def.'s Mot. Ex. 19, ECF No. 83-19). Another use permit, executed about ten years afterwards, only delegates responsibility for "minor repairs" to the Tribe. (Def.'s Mot. Ex. 20, ECF No. 83-20). For reasons unbeknownst to the parties and the Court, BIA and the Tribe ceased executing additional permits when the second use permit expired in 1976. (Def.'s Mot. at 17). The Tribe however maintained responsibility for all repairs—major and minor—for the Tribal addition, including on at least one occasion replacing the roof of the Tribal Addition to address leaks. (*Id.*; *see also* Def.'s Mot. Ex. 33, ECF No. 84-3).

Although roof leaks persisted into the 2000s, BIA decided to not replace the roof, instead making "patch repairs" to reduce leaking. (*See* Def.'s Mot. at 18). Eventually in 2014, after several large storms passed through Eagle Butte, inspectors discovered mold in the Building. (Def.'s Mot. at 18–19, Def.'s Mot. Ex. 34, ECF No. 84-4). In January 2014, the United States decided to forgo further maintenance and repair, ceased operations in the Building, and "coordinated an emergency move out" of the Building. (Def.'s Mot. at 18). Around November 2014, the Tribe also relocated its operations and exited the Building. (Pl.'s Resp. at 28). By 2016, BIA inspection recommended that the Building be "condemned and demolished" instead of repaired, but the United States never finalized demolition. (Def.'s Mot. at 19). After evacuating the Building, the tribal offices moved to a boarding school dormitory in Eagle Butte, and the Tribe continued to use the Cheyenne River Motel, a tribally-owned facility, for conducting Tribal Council meetings. (Pl.'s Resp. at 28). BIA also secured a lease to a building in Eagle Butte known as the Western Sky Building and continues to operate out of that building. (*Id.*). Alleging that the United States' actions have deprived the Tribe of its use of Building 2001 and the tribal lands on which it sits, the Tribe brought this lawsuit. (*See* Compl., ECF No. 1).

## II.   Analysis

The United States now moves for summary judgment. (Def.'s Mot.). The Court will grant summary judgment when there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that can significantly impact the outcome of the litigation. *Id.* at 248. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court acts with caution in granting summary judgment and may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255. While the Court does not weigh each side's evidence at the summary judgment stage, the "inferences to be drawn from the [underlying] facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

### A.   *The Tribe's Breach of Contract Claim*

The United States claims that the parties never entered a contract for the ownership, maintenance, or repair of Building 2001. (Def.'s Mot 20–25). The party alleging the existence of

6

a contract with the United States, either express or implied, must show a mutual intent to contract, consisting of an offer, an acceptance, and consideration, and that the government representative who entered the agreement had the authority to bind the United States. *Fincke v. United States*, 230 Ct. Cl. 233, 244 (1982); *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). The Tribe has not shown that an implied-in-fact or express written contract agreement existed between the United States and the Tribe.

The Tribe claims that the Tribal Resolution constituted an offer and that "the United States manifested its assent to the terms of the Tribe's offer in a manner invited by the Tribe, namely approval of the Tribal Council Resolution . . . ." (Pl.'s Resp. at 30). This characterization is incorrect because the approval of the Tribal Resolution was not "invited by the Tribe," nor subject to the Secretary's bargaining power. The Oahe Act stated that just compensation for the Oahe Dam Project would be paid to the Tribe "when the Secretary of the Interior [] by proclamation declare[s] that this agreement has been ratified and approved in writing by three-quarters of the adult members" of the Tribe. Oahe Act, § 1, 68 Stat. 1191. Far from constituting an offer and acceptance, both the Tribal Resolution and BIA's approval of the Resolution were ministerial actions required by law, and as the Court has stated, when "rights and obligations are prescribed by statute and regulations rather than determined through the mechanics of a bilateral exchange, there is no contract in the usual sense of that word." *Clawson v. United States*, 24 Cl. Ct. 366, 370 (1991); *see also Chattler v. United States*, 632 F.3d 1324, 1332 (Fed. Cir. 2011) (government's expression of intent to expedite passport application in exchange for payment of $60 fee did not create a contract because its language lacked "the formalities of typical government contracts"); *Schneiter v. United States*, 159 Fed. Cl. 356, 370 (2022) ("contract claims that rely upon an extension of duties or rights established by statute or regulation are generally not plausible.").

Under the Oahe Act, the Secretary was obligated to inform Congress that the Tribe had approved relocation with the assent of two-thirds of its members, but the Secretary's execution of this duty is not tantamount to accepting a contract offer. *De Archibold v. United States*, 57 Fed. Cl. 29, 32 (2003) ("It is well-established that a duty imposed by law does not create a contract within the Tucker Act jurisdiction of this court."); *see also City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir. 1998) (noting that implied-in-fact contracts which are formed by the parties' conduct in absence of express agreement "differ significantly" from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims).

Previously, in *Navajo Nation v. United States*, 46 Fed. Cl. 217 (2000), the Court reviewed challenges against the Assistant Area Director of the BIA's exercise of power (acting under authority delegated by the Secretary of the Interior) to approve the terms and conditions of leases between the Navajo Nation and coal companies. The Indian Mineral Leasing Act of 1938 allowed unallotted lands within any Indian reservation to be leased for mining purposes "by authority of the tribal council," and subject to "the approval of the Secretary of the Interior." *Id.* at 228. When the Navajo Nation later challenged the Secretary's approval of leases under the theory that they included unreasonably low royalty rates, the Court found no contract cause of action. *Id.* at 234–36. Specifically, the Court found that the Secretary's approval of the lease did not constitute "intent on the part of the Secretary to assume a contractual obligation," and instead was "no more than the fulfillment of the Secretary's statutory duties . . . ." *Id.* at 235; *see also*

*Navajo Nation v. United States*, 263 F.3d 1325, 1341 (Fed. Cir. 2001) ("As the Court of Federal Claims correctly noted . . . there is no evidence of an intent by the government to assume any contractual obligations under the Lease."); *Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1325 (1997) ("The party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration."). Here, the Secretary's authority behind issuing the approval letters flowed directly from the Oahe Act and as the Supreme Court noted, absent clear indication to bind the United States in a contract, "the presumption is that 'a law is not intended to create private contractual or vested rights, but merely declare[] a policy to be pursued until the legislature shall ordain otherwise.'" *Nat'l R.R. Passenger Corp. v. Atchison, T. & S.F.R. Co.*, 470 U.S. 451, 465–66 (1985) (citing *Dodge v. Board of Education*, 302 U.S. 74, 79 (1937)). To overcome this presumption, the party asserting a contractual relationship must identify language in the regulatory or statutory language that implies a contractual relationship. *Brooks v. Dunlop Mfg. Inc.*, 702 F.3d 624, 630–31 (Fed. Cir. 2012).

The Tribe alleges that the United States entered into a contract with the Tribe when "it accepted" from the Tribe certain tribal land for the relocation of the Cheyenne River Agency and, "in return, the United States pledged that" the Tribe would have "an ownership interest" in the Building, "the right to use" the Building, or a part of it, for its Tribal Council Chambers and government offices, and "a reversionary interest" in the entire Building when it ceased to be used by the United States. (Am. Compl. at 14, ¶ 61, CF No. 13). However, the Tribe has not shown that the text of the Oahe Act or the Secretary's approval letter here include words typically associated with bargaining or contract formation, such as the terms "offer," "acceptance," or "consideration." *See e.g.*, *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 787 (2015) (finding that plaintiff's "failure to identify any language in the [legislation] or regulation that suggest contract formation" is determinantal to breach of contract claim). Contrary to the Tribe's position, the Tribal Resolution was presented to BIA not as "an offer" but as a "request," or "recommendation." (*See* Def.'s Mot. Ex. 14 at 3, The Tribal Resolution, ("the Secretary of the Interior is hereby requested to approve this resolution . . . ."); Pl.'s Resp. Ex. Q, BIA Approval Letter (noting that "the site recommended by" was "accepted by" BIA)).

To recover for breach of contract, plaintiffs must show an obligation or duty "arising out of a contract," and not one existing by operation of law. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The Tribe cannot show this. The language used by the Superintendent in transmitting the Tribal Resolution for the Secretary's approval also suggests that the Tribe understood BIA's approval to be required by law—and not as a matter of contract negotiation. (*See* Pl.'s Resp. Ex. P at 1, ECF No. 96-16 (noting the Tribe's understanding that without the Secretary's approval within 90 days, the action would be completed "as stipulated by the Constitution and By-Laws of the Tribe"); *id.* at 3 (noting that the Tribe believed "that it was the intent of Congress in Public Law 776" to build the Building on reserve land)).

Further, neither the Tribal Resolution nor the Secretary's approval letter can be conceived as a contractual offer and acceptance because they both lack unambiguous terms of performance. *Franklin Sav. Corp. v. United States*, 56 Fed. Cl. 720, 742 (2003) ("[A]n offer must specify a promise to perform the terms of an express contract. The terms of the offer must be specific and unambiguous, so that acceptance of that offer will cement a binding bargain enforceable by law."). The parties' disagreements in this case revolve around each party's duty to maintain and

repair the Building and any consideration exchanged for establishing those duties. The Tribal Resolution and the approval letter do not mention repair or maintenance duties, nor do they clarify the exchange of benefits. *See LaMirage, Inc. v. United States*, 44 Fed. Cl. 192, 197 (1999) (finding that to establish "a meeting of the minds and mutual agreement regarding specific contract terms, there must have been an *unambiguous* offer to contract upon specific terms, an unambiguous acceptance of that offer, and an intent to contract.") (emphasis added). More importantly, the Secretary did not have the authority to condition the execution of the United States' obligations under the Oahe Act to more than what was prescribed by Congress. *See* Oahe Act, § 1 ("That this agreement when enacted by Congress and when confirmed and accepted in writing by three-quarters," of the adult Indians of the Tribe, should be "subject . . . to the conditions . . . hereinafter set forth," in the Act.).

The Tribe also claims that the United States accepted a conditional offer "by performance, namely construction of Building 2001," citing generally to the Restatement (Second) of Contracts § 50. (Pl.'s Resp. at 30). However, the Oahe Act mandated BIA's construction of Building 2001 and specifically subjected it to the conditions Congress prescribed by law. *See* Oahe Act, §1. The Tribe does not provide more than a "cloud of evidence" to show that the BIA Commissioner had the authority to bind the United States to a contract that expanded the conditions expressly set out in the Oahe Act. *D&N Bank v. United States*, 331 F.3d 1374, 1377 (2003) ("The government representative whose conduct is relied upon must have actual authority to bind the government in contract."). The Tribe has not met its burden of proving that the parties' conduct evinced mutuality of intent to contract, lack of ambiguity in offer and acceptance, exchange of consideration, or involved assent by a government representative that had actual authority to bind the United States in contract. As such, the Court grants the United States' motion for summary judgment as to the Tribe's breach of contract claim.

### B. The Tribe's Breach of Trust Claim

The United States argues that the Tribe has no valid breach of trust claims because (1) Building 2001 is not a trust asset, and (2) there is no specific language in any statute, treaty, or regulation that creates a trust duty for the United States to maintain or repair Building 2001 for the benefit of the Tribe. (Def.'s Mot. at 33–41). The United States also raises two jurisdictional challenges to the Tribe's trust claims. First, that the Tribe waived its breach of trust legal claims by signing a global settlement with the United States in 2013, and second, that the Tribe's claims accrue outside of this Court's six-year statute of limitations under 28 U.S.C. § 2501. (*Id.*).

The United States has not shown that the Tribe's claims are barred by the statute of limitations. The Tribe's amended complaint seeks recovery on the basis that the United States "prevented the Tribe from using [the Building] or any part of it, including the additions to the Building made by the Tribe." (*See* Am. Compl. at 15, ¶ 38). The limitations period begins to run at "the date when *all events*," that fix the alleged liability of the United States and permit the assertions of the claim have occurred. *Samish Indian Nation v. United States*, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003)) (emphasis added). BIA informed the Tribe that Federal operations had been shut down in Building 2001 on January 31, 2014. (*See* Def.'s Mot. Ex. 37, ECF No. 84-7). BIA's January 31 letter is the earliest evidence in the record that can be read to manifest the United States'

9

intention to prevent the Tribe from using the Building. (*See id*.). In its letter, BIA notified the Tribe that "no lease or permit exists at the present time which would provide the Tribe with any legal right of occupancy," and even if it did, the BIA intended to rely on the results of its air quality testing to "cancel [the] lease," or "revoke [the] permit." (*Id*.). The letter also noted that entrances to "the Agency area of the Building," had been "secured." (*Id*.). As indicated in the letter, the Tribe had the right to appeal the BIA's January decision. (*Id*. at 3). Therefore, BIA's decision did not become final until 30 days after delivery, or March 2 or 3.

Furthermore, the January 31 letter still spoke of ongoing "remediation efforts," and the United States has averred that it did not forego all further repairs and maintenance until after April 29, 2014. (OA Tr. at 28:11–20; *see also* Def.'s Mot. Ex. 37 ("[W]e will continue to keep the Tribe informed about our Agency remediation efforts . . . .")). While the Tribe knew of the reoccurring maintenance issues in the Building, it had no reason to anticipate that the United States would evacuate the Building, exercise the right to control entry and access to the Building (including the Tribal Annex), and conclusively forgo all further repairs, until sometime in March or April of 2014. (*See id.* at 3 ("After receipt of this letter, all entry by non-Bureau staff must be pre-approved with Superintended.")). The Tribe filed the Complaint in this case on February 4, 2020. (Compl.). Consequently, the Tribe's claims pertaining to "loss of use of the Building (and the land on which it sets)" and failure to repair and rehabilitate are within the six-year statute of limitations, and the Court can consider if the Tribe has alleged a valid breach of trust claim. (*See* Am. Compl. at 14, ¶ 60).

In *United States v. Mitchell*, 463 U.S. 206, 216–17, 219 ("*Mitchell II*") (1983), the Supreme Court identified the three essential elements of the trust relationship between the United States and the Indian tribes: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus. *Mitchell II*, 463 U.S. at 225 (quoting *Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171 (1980)). In *United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011), the Supreme Court clarified that the United States assumes Indian trust responsibilities "only to the extent it expressly accepts those responsibilities," in the underlying source of law. *Id*. at 177; *see also United States v. Navajo Nation*, 556 U.S. 287, 301 (2009) ("*Navajo II*") (finding that trust relationship exists when the underlying statutory language "bears the hallmarks of" creating a conventional fiduciary relationship).

The United States relies heavily on the Supreme Court's recent decision in *Arizona v. Navajo Nation*, 143 S. Ct. 1804 (2023), to argue that no underlying source of law identifies the Building as a trust asset or identify a trust duty to maintain the Building in this case. (*See* Def.'s Notice of Add. Authority, ECF No. 100; *see also* OA Tr. at 43:2–10). It is correct that the Supreme Court's analysis in *Navajo Nation* sharply focused on analyzing the "specific provisions of positive law" in determining the existence and scope of trust duties. *Id*. at 1817. The majority contrasted that approach with cases where courts were—falsely—inferring a trust relationship by relying on common law principles, the "political branches' general moral obligations to Indians," or similar broad concepts. *Id*. In applying this textual approach to the treaty in that case, the Court found that the language of the 1868 treaty with the Navajo Nation, which "set apart" a reservation for the "use and occupation of," that tribe, did not impose a trust duty on the United States to take affirmative steps to secure water for the Navajo Nation in perpetuity. *Id*. at 1813–14. Yet, the United States' attempt at analogizing this case to *Navajo Nation* is unpersuasive.

10

The *Navajo Nation* treaty did not include *any* express language discussing reserved water rights, let alone one imposing an affirmative duty to provide the tribe with water. *See id.* at 1811 (noting that even the Navajo Nation's right to reserved water was not expressly articulated in treaty's text but was instead assumed under the Supreme Court's "longstanding reserved water rights doctrine"). Unlike the Navajo Nation treaty's silence on the issue of water rights, here the Treaty expressly includes "rights-creating or duty-imposing" language that directly addresses the status of the building. *Id.* at 1815 (finding that whether the United States has expressly accepted trust obligations must train on specific "rights-creating or duty-imposing" language in each treaty).

In Article IV of the Treaty, the United States stated it "agrees, at its own proper expense, to construct," an "agency building for the residence of the agent." In Article V, the United States stated it "agrees that the agent for said Indians shall in the future make his home at *the* agency building," and that the agent "shall reside among," the Tribe to "keep an office open at all times for the purpose of prompt and diligent inquiry," into the Tribe's affairs. (Emphasis added). No sunset provision exists for this obligation. Such language bears the hallmarks of establishing fiduciary responsibility over the existence of one agency building that would serve as the Agent's headquarters. Critically, the Supreme Court itself in *Navajo Nation* pointed to the provisions that imposed on the United States the duty to construct certain buildings as an example of a provision that *does* create an affirmative duty; after noting that the 1868 Navajo treaty "*did* impose a number of specific duties on the United States," the majority followed: "For example, the treaty required the United States to construct a number of buildings on the reservation . . . ." 143 S. Ct. at 1813 (emphasis added). Article III of the 1868 Navajo Treaty referenced by the Court for that proposition contains language nearly identical to the Fort Laramie Treaty. *See* Treaty Between the United States of America and the Navajo Tribe of Indians, June 1, 1868, art. III, 15 Stat. 667, 668 (ratified Aug. 12, 1868) ("[T]he United States agrees to cause to be built . . . an agency building for the residence of the agent[.]").

At oral argument, the United States contended that despite this clear language, the Court can read the language as to simply obligate the presence of the agent on Tribal land at *some* building—though not necessarily the building constructed for that purpose. (*See* OA Tr. at 48:2–12 (United States arguing that "the important part," is to have "an agent available," and that now "the agency building is the Western Sky Building.")). But the Treaty's language clearly anticipates that the Building housing the Agent must have been constructed for that purpose. *See* art. V (mandating that the United States constructs an agency building for "the residence of the agent."). When speaking of the obligation to maintain the Agent on the reservation, the Treaty does not speak of the Agent's presence in "some Building," or "a Building," but "*the* agency building." art. IV. The United States cannot demand linguistic rigor from the Tribe in identifying the underlying source of its trust claims while seeking linguistic flexibility in interpreting that source after it is identified. That approach seems to conflict with *Navajo Nation*'s central holding which dictates close adherence to the text of the underlying treaty. 143 S. Ct. at 1817 (noting that "tribes' legal claims against the Government must be based on specific provisions of positive law" as opposed to the common law). Moreover, the historical relationship between the Tribe and the United States demonstrates that the United States recognized on multiple occasions its obligation to reconstruct a specific building under the terms of the original Treaty.

While the modern circumstances on Tribal land may very well have allowed the Agent to temporarily relocate to another building somewhere else on the reservation, the Court cannot glean from that anomaly that the original express obligations laid out in the Treaty are changed retrospectively. *Choctaw Nation v. United States*, 318 U. S. 423, 432 (1943) ("Indian treaties cannot be rewritten or expanded beyond their clear terms."). In *Navajo Nation*, the Court reaffirmed that only "Congress and the President may update the law to meet modern policy priorities and needs." *Id*. at 1814. The theory advanced by the United States would have the Court view the United States' obligation as a one-and-done, with nothing more to do in the hypothetical scenario where the Building would have been destroyed the day after it was built. (*See* Def.'s Reply at 18, ECF No. 98). Yet in this case, the congressional practice contradicts that attitude. In fact, in every instance where Congress or the President revisited the obligations laid out in the Fort Laramie Treaty, it was to reaffirm and repeat the obligation to construct "the" Agency building on the reservation. The Presidential Proclamation 295, issued in February of 1890 set aside land in reserve for "Cheyenne River Agency, school, and certain other buildings" when the Tribe relocated. In 1938, when the Secretary of Interior approved the Tribal Constitution and By-Laws, the Secretary approved provisions that explicitly referenced the Agency Building. (*See* Pl.'s Resp. at 16 (citing to Exs. E, F, ECF Nos. 96-5, 96-6)). The Oahe Act also required the "reconstruction of the Cheyenne River Agency." Oahe Act § 4 (*see also* Pl.'s Resp. Ex. 16 at 3, November 2, 1960, Letter ("We are of the opinion that it was the intent of Congress in [the Oahe Act] to relocate and reconstruct all schools, hospitals, and other facilities in the same status as they were at the Old Agency site – on reserve land.")). Therefore, the United States' practice in the aftermath of the Fort Laramie Treaty also fails to reflect an intention to simply locate the agent to another building on the reservation. Those terms—"relocate" and "reconstruct"—speak to a continuity of obligation.

As the Court held in *Navajo Nation*, any trusts established or duties self-imposed by the United States for a tribe's benefit should be defined and governed by the text of the underlying source of law and not by common-law principles. 143 S. Ct. at 1817. Here, the text of the underlying treaty can be read to include the United States' self-imposed obligation to construct "an agency building for the residence of the agent," and that language can be interpreted to imply the duty to maintain the building originally constructed so that it will continue to serve as the Agency building. *See*, the Treaty, art. IV. This much can follow directly from *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 468 (2003), where the Supreme Court stated that "under elementary trust law," after a trust responsibility is established, the fiduciary "may not allow it to fall into ruin on his watch." *See also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572 (1985) ("[O]ne of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."). Because a trust duty can be traced to the Treaty's text, at trial the Tribe should be given the chance to show if the United States has a trust duty to maintain, protect, repair, and preserve the Building. *See e.g.*, *White Mountain Apache Tribe*, 537 U.S. at 473 (holding that evidence of "elaborate control" or "supervision" over trust property can support existence of "fiduciary duty to manage"). Determining the existence of and the nature of the trust duty in this case requires further examination of the factual evidence and is therefore better suited for trial rather than disposal at the summary judgment stage. (*See e.g.*, Def.'s Mot. Ex. 5, BIA Mar. 26, 1957, Letter (noting BIA's understanding that the United States "assum[ed] all responsibility for maintenance and operation" of the Old Agency Building, and that "[i]t is [] the Tribe's contention that such responsibilities should continue and carry over to the new site.")); *Young Enterp., Inc. v. United States*, 26 Cl. Ct. 858, 863 (1992) ("A trial court

may exercise discretion to deny summary judgment when it is not reasonably certain that there is no triable issue of fact.").

The Court does not decide at this point if the Building itself is a trust asset, only that the United States' assertions to that effect do not resolve all factual disputes about the Tribe's potential interest in the Building. For example, BIA's letter approving the Tribal Resolution never directly addressed the Tribe's contention that the Tribe maintains a reversionary interest in the Building. (*See* Def.'s Mot. Ex. 14 at 3, The Tribal Resolution; *see also* Pl.'s Resp. Ex. Q, BIA Approval Letter). The United States nonetheless points to the Commissioner of Indian Affairs' December 18, 1956, letter to the Tribe (prior to the Tribal Resolution's adoption) in which the Commissioner stated that "established bureau policy" dictates that "if and when the agency buildings, etc., became surplus to the needs of the government, such property would be made available to the tribe." (Def.'s Mot. Ex. 8, ECF No. 83-8). The United States claims that the phrase "established bureau policy" refers to Public Law 991 which gave the Secretary of the Interior discretion to convey title to any federally owned buildings that are no longer required for the Government's administration "as he may deem appropriate." (Def.'s Mot. at 23). This implies, the United States argues, that whatever the Tribe's future interest in the Building may have been, it rested in the hands of the BIA as supported by that letter. (*Id.*). Yet, critically, the letter itself does not include any citations to Public Law 991, and the United States does not provide any additional factual evidence to conclusively establish that Public Law 991 is indeed the law being referenced in the letter. (*See id.*); *see also Mingus Constructors Inc. v. United States*, 812 F.2d 1387, 1390–91 (Fed. Cir. 1987) (finding that the Court must "resolve[] all doubts and inferences against the party whose motion is being considered" at the summary stage).[5]

To further elucidate what the BIA Commissioner might have meant, the United States then cites to "the 2023 version" of BIA's regulations under Public Law 991 that define "excess property" and describe the process for transferring such property (Def.'s Mot. at 23); but regulations in place today cannot clarify what "established bureau policy" was in 1956. Moreover, relying on the BIA Commissioner's words to determine the Tribe's future interest in the Building begs the question. As the Court noted in addressing the Tribe's breach of contract claim, to the extent that the Parties' interests can be gleaned by analyzing the text of the Treaty and subsequent congressional acts, the BIA Commissioner was and is without authority to change that legal status through executive fiat (just as he could not subject the Tribe's interest to contract conditions). In fact, in this case it is far from clear if Congress's intention was to allow "established bureau policy" to determine or govern the Tribe's future interest in the Building. In no uncertain terms, the Oahe Act expressed the United States' intention to relocate and reestablish the Tribe "to a condition not less advantageous" than the one "the [Tribe] now are in." Oahe Act, § 5. Section VII of the same Act acknowledged the Tribe's right to "salvage any portion of the improvements" on the old reservation. Reading the two provisions together, the United States cannot diminish the Tribe's future interest in the improvements on the land today from what the Oahe Act deems them to be without leaving the Tribe in a "less advantageous" position than it was before it agreed to relocate. Oahe Act, § 4, 5. The Oahe Act itself did

---

[5] Many other references to laws or regulations in the official letters are accompanied by citations clarifying the underlying source of authority. (*See e.g.*, Def.'s Mot. Ex. 16 (identifying Public Law 776); Pl.'s Mot. Ex. 10 (same)).

recognize the Tribe's future interest in the Old Agency Building by giving the Tribe salvage rights over all improvements on that settlement. Oahe Act, § 7 (giving the Tribe "the right without charge to . . . salvage any portion of the improvements within said taking area . . . ."). Therefore, because the Oahe Act was not silent as to the scope of the Tribe's future interest in improvements on the land, the Oahe Act's "relate back" language raises doubts about whether the BIA Commissioner could supplant what the law might have envisioned as the Tribe's future interest with "established [BIA] policy."

Because the Court finds that the Tribe can adequately trace its breach of trust claim to the Treaty, the Court also rejects the United States' argument that the trust claim is barred by the 2013 settlement, as that settlement includes an exception for claims arising out of the Fort Laramie Treaty. (*See* Mot. to Am. Pleading Ex. 1 at 8, ECF No. 69-1 (excluding claims "regarding the 1868 Treaty of Fort Laramie . . . .")). Therefore, the Court rejects the United States' motion for summary judgment as to the breach of trust claims.

### C.  The Tribe's Takings Claim

The United States maintains that the Tribe's takings claim suffers from two flaws: (1) that the Tribe lacks a cognizable property interest in the Building, and (2) that the Tribe's claims are based on "alleged government inaction" which cannot form the basis of a takings claim. (Def.'s Mot. 41–7). The United States' motion for summary judgment on this issue does not resolve all issues of fact.

The Fifth Amendment to the U.S. Constitution mandates that the United States provide "just compensation" for taking private property. U.S. Const. amend. V. The Court's two-part analysis for assessing the validity of takings claims includes first determining whether the claimant has identified a "cognizable Fifth Amendment property interest," and second, whether that property interest was "taken." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted).

In this case, the United States claims the Tribe has not identified a cognizable property interest in the Building. The United States claims that because Building 2001 "is owned by the United States," no valid property interest exists. (Def.'s Mot. at 45). This argument is not fully supported. For one thing, the Tribe's takings claim as expressed in the amended Complaint also includes the land underneath the Building, and the United States does not dispute that the land underneath is owned by the Tribe. (*See* Def.'s Mot. Ex. 18, May 8, 1957, BIA Letter (noting that "the site for relocation shall be tribally owned land."); *see also* OA Tr. at 22:11–12 (United States: "Yes, I believe that the United States took all of that land into trust.")). The United States also avers that the Tribe has a property interest in the Tribal Addition that was built by the Tribe. (*See* Pl.'s Resp. at 24 (citing Def.'s Mot. Ex. B, 30(b)(6) Deposition of the United States)). Therefore, the Tribe has not failed to identify cognizable property interests that could potentially entitle the tribe to takings damages.

The Court also rejects the United States' contention that this case merely involves allegations of government inaction. The United States' reliance on the Federal Circuit's line of flooding cases, including *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1361 (Fed. Cir. 2018), is not completely dispositive of factual issues in this case. In *St. Bernard Parish*, the

14

Federal Circuit held that allegations based on the United States' "failure" to act (in that case the United States' decisions not to armor flood banks or to repair erosion along the banks) cannot form takings claims. *Id.* at 1360. However, in this case, the Tribe's allegations do not solely arise from the United States' failure to repair or maintain the Building. The Tribe also challenges the United States' decision to cease all maintenance and repairs "following the discovery of mold" in the Building based on testing ordered by the United States, and in particular, the Tribe disputes the method the United States deployed in making that determination. (*See* Def.'s Notice Ex. B, ECF No. 105-2 (noting that the BIA "coordinated an emergency move" from the Building as "the result of air tests" conducted by the United States' inspectors); Pl.'s Resp. at 25 (asserting that "[t]he level of mold found in Building 2001 in 2014 did not warrant closure of the building.")).

Moreover, the Tribe also asserts that the decision to demolish the Building interfered with the Tribe's use of the Tribal Addition. (Pl.'s Resp. at 28). Last, but not least, the United States' supervision of the Building's evacuation can hardly be described as "inaction." In its January 2014 official letter, BIA notified the Tribe that Tribe was without "any legal right of occupancy," and expressed BIA's intention to fully evacuate the Building. (Def.'s Mot. Ex. 37 at 2). Factual evidence suggests that to this day, despite lingering factual disputes over ownership and use of the main Building, the Tribal Addition, and the impact of any damage on the underlying land, BIA continues to unilaterally control the Building conditions. (*See* Def.'s Notice at 1 (BIA posted signs on all or most entrances to the Building that read "use or occupancy is prohibited by the U.S. Department of the Interior.")). Furthermore, in at least one instance despite availability of authorized funding to repair the roof, the BIA, for reasons yet unknown, never proceeded to repair the roof. (Def.'s Mot. Exs. 27, 28, ECF Nos. 83-27, 28; *see also* Def.'s Mot. at 18). Therefore, the Tribe's exit from the Building could be categorized as what the Federal Circuit in *St. Bernard Parish* labeled as "direct, natural, or probable result of authorized government action." *Id.* at 1360. The United States' authority to take these actions and the extent of the damages resulting from each action remains subject to factual disputes better suited for trial. Therefore, the Court finds that the United States is not entitled to judgment as a matter of law as to the Tribe's takings claims.

### III.     Conclusion

For the stated reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the United States' motion for summary judgment. (ECF No. 83). The Court **ORDERS** the parties to meet and confer and file a joint status report with proposed pre-trial dates and a trial date within seven days of issuance of this order.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge