# In the United States Court of Federal Claims

No. 20-126
Filed: August 14, 2024

---

**CHEYENNE RIVER SIOUX TRIBE,**

*Plaintiff,*

**v.**

**THE UNITED STATES,**

*Defendant.*

---

*Steven J. Gunn*, Steven J. Gunn, Attorney at Law, St. Louis, MO, and *Mark C. Van Norman*, Special Counsel to the Cheyenne River Sioux Tribe, Rapid City, SD, for Plaintiff.

*Hannah E. O'Keefe*, Trial Attorney, *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, Natural Resources Section, U.S. Department of Justice, Washington, D.C., with *Victoria A. Cejas*, *Shani N. Sumter*, and *Kristen D. Kokinos*, Of Counsel, Department of the Interior, Office of the Solicitor, Washington, D.C, for Defendant.[1]

## POST-TRIAL OPINION AND ORDER

**TAPP, Judge.**

> [A]t every opportunity when given the chance to help its neighbors, the community in which it's situated, the United States government declined to do so. . . . Our government had the opportunity to employ measures which would foster the continuation of the lifestyle and the culture of [the Cheyenne River Sioux Tribe], and it did not, choosing instead a path which, as we eloquently heard . . . , further dilutes a unique community and leading it one step closer towards decay.

---

[1] Hannah O'Keefe was counsel of record prior to and during trial. On July 17, 2024, William J. Shapiro filed a Notice of Appearance, (ECF No. 182), thereby terminating Ms. O'Keefe's involvement on the record. Because Ms. O'Keefe was counsel of record during trial, her name appears in the introduction of this Opinion.

(Trial Transcript[2] ("Tr.") Court, 1433:11–14, 1433:16–20) (emphasis added).

In its latest dispute with the United States, the Cheyenne River Sioux Tribe ("the Tribe") sought redress for the deteriorating conditions of a building ("the Building" or "Building 2001") on the Tribe's reservation in Eagle Butte, South Dakota. The Tribe claims that the failure to repair the Building, which housed an agent of the United States and tribal headquarters, violated trust obligations and amounts to a taking under the Fifth Amendment. It does not.

The Court tried this case in Rapid City, South Dakota in the spring of 2024. Although given every opportunity to present its theory, missteps plagued the Tribe's presentation such that at the closing of evidence the Court determined the Tribe was not entitled to monetary relief. There should be no mistake; though the United States exhibited indifference to the culture and community of this Tribe,[3] it met its legal obligations.

The evidence presented to the Court at trial was "both overwhelming and extremely underwhelming." (Tr. Court, 1426:20). Witness testimony was poignant at times, on one occasion moving some in the courtroom audience to tears. Ultimately, however, the Tribe failed to shoulder its burden of proof; and despite the Court's serious misgivings about the treatment of the Tribe, the Tribe did not show that the United States' failure to repair the crumbling Building violated trust obligations or constituted to a taking. Even if the Tribe met the elements of a breach of trust or takings claim, its proof of damages was entirely unconvincing, dependent on construction costs in the city limits of Chicago and rental values derived from cursory internet searches. Accordingly, the United States is entitled to judgment.

## I.   Procedural History

The Tribe's Complaint, (Compl., ECF No. 1),[4] asserted three causes of action: (1) a breach of trust claim, (2) a breach of contract claim, and (3) a Fifth Amendment takings claim. (Am. Compl. at 10–15). Generally, the Tribe's trust claim was based on a supposed agreement that Building 2001 would be held in trust for the benefit of the Tribe as well as the Bureau of

---

[2] The Trial Transcript consists of 1435 pages and is separated into six volumes located at ECF Nos. 169 (pp. 1–279), 172 (pp. 280–561), 174 (pp. 562–869), 176 (pp. 870–1144), 179 (pp. 1145–1392), and 181 (pp. 1393–1435). The Court cites the Transcript using the name of the testifying witness, counsel, or the Court, then the consecutive pagination and line numbers, (Tr. NAME, __:__–__).

[3] The conduct of the United States as described at trial undercuts the Bureau of Indian Affairs' ("BIA") stated purpose to improve the lives of American Indians: "[o]ur mission is to enhance the quality of life, promote economic opportunities, and to carry out the federal responsibilities entrusted to us to protect and improve the trust assets of American Indians and Alaska Natives." *Bureau of Indian Affairs*, U.S. Dep't of the Interior, Indian Affairs, https://www.bia.gov/bia (last visited Aug. 9, 2024).

[4] The Tribe later amended its Complaint. (Am. Compl., ECF No. 13).

Indian Affairs' ("BIA")[5] responsibility to repair and maintain the Building. (*Id.* at 12–13). The Tribe further contended that the United States, through the Secretary of the Interior, contracted with the Tribe when it relocated the Cheyenne River Agency to Eagle Butte, South Dakota, and subsequently breached its contractual obligations to repair and maintain the Building. (*Id.* at 14–15). The Tribe also claimed that the United States' failure to maintain the Building caused it to fall into such a state of disrepair as to constitute a taking. (*Id.* at 15). After summary judgment, only the trust and takings claims remained for trial. (Summ. J. Op., ECF No. 112).[6]

At trial in Rapid City, South Dakota, the Court heard from seven fact witnesses—including chairmen and officers of the Tribe, and representatives from BIA[7]—and four expert witnesses. The United States did not call witnesses. From the bench, the Court ruled that the Tribe failed, by preponderance evidence, to show it was entitled to compensation on either the tribal trust or the takings claim. (Tr. Court, 1429:7–10). Because the Tribe failed to carry its burden of proof, particularly as to damages, the Court did not permit post-trial briefing. (*Id.*, 1424:8–15, 1429:4–6).

## II.   Findings of Fact

The Cheyenne River Sioux Tribe is a federally recognized and constituent tribe of the Great Sioux Nation. (Joint Stipulations of Fact ("JSOF") at ¶ 1, ECF No. 147). The Cheyenne River Sioux reservation consists of nearly 1.5 million acres in central South Dakota and has approximately 16,000 enrolled members.[8] Only 7,600 people live on the reservation.[9] For comparison, the reservation is about twice the size of Rhode Island, with less than one percent of

---

[5] BIA falls within the Department of the Interior.

[6] In 2023, the Court granted-in-part and denied-in-part summary judgment for the United States. (Summ. J. Op. (published as *Cheyenne River Sioux Tribe v. United States*, 168 Fed. Cl. 465 (2023)). The Court dismissed the breach of contract claim because the United States' acceptance of a tribal resolution did not constitute an implied-in-fact or express contract with the Tribe. (*Id.* at 6–9). The Court also found that factual issues regarding the breach of trust and takings claim remained for trial. (*Id.* at 9–15).

[7] The three Tribal Chairmen are Mr. Ryman LaBeau (2022–present), Mr. Kevin Keckler (2010–2014), and Mr. Harold Frazier (2002–2006, 2014–2022). The Tribal officers are Ms. Benita M. Clark, Tribal Treasurer (1994–2023), and Ms. Ev Ann White Feather, Tribal Secretary (2006–present). The BIA representatives are Mr. Gregg Bourland, Superintendent for BIA's Cheyenne River Agency, and Mr. Timothy LaPointe, former Director for BIA's Great Plains region; both men served as fact witnesses for both the Tribe and the United States.

[8] *See Cheyenne River Agency*, U.S. Dep't of the Interior Indian Affairs, https://www.bia.gov/regional-offices/great-plains/south-dakota/cheyenne-river-agency (last visited Aug. 9, 2024).

[9] *Cheyenne River Reservation and Off-Reservation Trust Land, SD*, U.S. Census Bureau, https://data.census.gov/profile/Cheyenne_River_Reservation_and_Off-Reservation_Trust_Land,_SD?g=2500000US0605 (last visited Aug. 9, 2024).

the population.[10] Life on the reservation is difficult; only about half the population is employed, with thirty-five percent living in poverty.[11]

The Great Sioux Nation and the United States entered into the Fort Laramie Treaty of April 29, 1868 ("Fort Laramie Treaty" or "Treaty"). (*Id.* at ⁋ 2; *see also* Treaty Between the United States of America and different Tribes of Sioux Indians, 15 Stat. 635, 636 (Apr. 29, 1868) ("PX 1564")). The Tribe itself has a nation-to-nation relationship with the United States (*Id.* at ⁋ 5). Today, BIA largely manages the Tribe's relationship with the United States. (*See* Summ J. Op. at 4, ECF No. 112). BIA's representative to the Tribe—the Agency Superintendent—used to be housed in Building 2001. (*Id.*; JSOF at ⁋⁋ 14, 16).

The Building sits on the corner of Main Street, between B Street and E Street, approximately 0.3 miles south of Highway 212 in Eagle Butte, South Dakota. (JSOF at ⁋ 13). The Building itself is federal property, (PX 79); it is located on tribal land held in trust by the United States for the benefit of the Tribe. (JSOF at ⁋ 14). The Building has two units: BIA North and Tribal South. (*Id.* at ⁋ 15). BIA North runs parallel to Main Street and its northeast entrance led to the BIA's Cheyenne River Agency offices; it was used by BIA staff. (*Id.* at ⁋ 15(a)). BIA North contained BIA offices for the Superintendent, Land Operations, Property and Supply, the Tribal Enrollment Office, Records Vault, Realty, Probate, and Office of the Special Trustee. (*Id.* at ⁋ 16).

Tribal South also runs parallel to Main Street, but its southern entrance led to Tribal Offices and was used by the Tribal government. (*Id.* at ⁋ 15(b)). Tribal South contained the Chairman's office and his staff, the Tribal Secretary's office, and offices for the Secretary's staff, Council Chambers, the recording room for the Tribal Council and Council offices, Legal Department offices, and the Tribe's Administrative Officer's offices. (*Id.* at ⁋ 17). Altogether, BIA North and Tribal South encompass 17,586 square feet, including basement boiler rooms. (*Id.* at ⁋ 21).

Building 2001 also has an addition ("Tribal Addition") constructed in 1977 and exclusively used by the Tribe. (*Id.* at ⁋ 18–19). The Tribal Addition contained Human Resources, Central Records, Payroll, Dispersing, Contracting and Accounting, Loan Office, the Treasurer's Office, and offices for the Treasurer's staff, Revenue Department, Planning Department, and Legal Department. (*Id.* at ⁋ 20). The Tribal Addition is attached to Building 2001 but is self-contained with its own roof, electrical and HVAC systems, and boiler room. (Tr. Bourland, 587:20–23, 624:10–6).

---

[10] *See id.*; *Rhode Island*, U.S. Census Bureau, https://data.census.gov/profile/Rhode_Island?g=040XX00US44 (last visited Aug. 9, 2024).

[11] *Cheyenne River Reservation and Off-Reservation Trust Land, SD*, U.S. Census Bureau, https://data.census.gov/profile/Cheyenne_River_Reservation_and_Off-Reservation_Trust_Land,_SD?g=2500000US0605 (last visited Aug. 9, 2024).



(DX 293). Although Building 2001 was originally constructed in 1959, (Tr. Bourland 515:21), it is the product of hundreds of years of history. (*See* Summ. J. Op. at 3).

Under the Fort Laramie Treaty, in exchange for the cessation of hostilities between the Sioux and the United States, the United States set aside land along the east bank of the Missouri River for the use and occupation of different tribes of the Great Sioux Nation. (PX 1564). In 1869, also in accordance with the Treaty, the United States constructed a building—at its own expense—to house the United States' agent to the Tribe and established the Cheyenne River Agency ("the Agency") within the Great Sioux Reservation. (*Id.*; *see* Tr. Lawson, 1362:18–19).[12] Dr. Michael Lawson ("Dr. Lawson")[13] testified that the Tribe understood the Treaty to require the United States to locate an agency building on the reservation. (Tr. Lawson, 1316:4–8). However, Dr. Lawson acknowledged that he extrapolated this opinion from documents

---

[12] The United States was also required to construct a variety of other buildings. (PX 1564 at art. 4).

[13] Dr. Lawson was qualified as an expert historian specializing in the Cheyenne River Sioux Tribe. (Tr. Lawson, 1286:10–1287:12).

discussing building relocation in the 1950s, not contemporaneous records discussing the Fort Laramie Treaty. (*Id.*, 1316:13–22 ("[the Tribe was] very specific in asking that it be located on tribal land and held in tribal reserve status.")).

In 1889, Congress passed a law that divided the Great Sioux Nation into different Sioux bands, including the Cheyenne River Sioux Tribe which was subsequently relocated to the west side of the Missouri River. (JSOF at ⁋ 6; *see* Tr. Sprague, 979:22–980:2, 981:4–5, 981:16–18). Further, in 1934, Congress passed the Indian Reorganization Act ("IRA") which set up tribal governments so they could establish bylaws, elect officers, and conduct business as a nation. (Tr. Sprague, 985:4–7 (discussing 48 Stat. 984 (June 18, 1934) (codified as amended at 25 U.S.C. § 5101 *et seq.*)). The IRA organized the Cheyenne River Sioux Tribe and its government; the Tribe created its constitution and by-laws in 1935 which were subsequently approved by the Secretary of Interior. 25 U.S.C. § 5123(d); (Const. & By-Laws of the Cheyenne River Sioux Tribe ("PX 1811"); *see also* Tr. LaPointe, 782:16–24). Under the Tribe's constitution, the Tribal Secretary is required to take minutes during council meetings and give two copies to the BIA Superintendent. (Tr. White Feather, 1374:22–1375:7). Thus, the Tribe formally adopted written record practices in 1935; accordingly, there is a written record of Tribal Council meetings and their contemporaneous understandings of the United States' actions since 1935. (*See id.*; Tr. Lawson, 1310:8–23).

During the Tribe's nineteenth century relocation alongside the Missouri River, the United States constructed the Old Agency Building. (JSOF at ⁋ 7). The Old Agency Building was located on tribal land held in trust by the United States for the benefit of the Tribe. (*Id.* at ⁋ 8; Tr. Sprague, 971:23, 986:2–6). The Old Agency Building served as the Agency office, home of the Tribal government, and various administrative services necessary to tribal life. (Tr. Lawson, 1308:10–1309:3). The Old Agency Building remained in that same location until 1944 when Congress enacted the Flood Control Act of 1944, authorizing construction of dams along the Missouri River, including the Oahe Dam. (JSOF at ⁋ 9–10); Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887; 33 U.S.C. § 701-1 *et seq*. Following that construction, tribal land, including the land where the Old Agency Building stood, flooded. (JSOF at ⁋ 10). The flooding forced the Tribe to relocate again. (*See id.*).

In 1954, the United States agreed to purchase tribal land around the planned dam and pay for relocating and reestablishing the Tribe in South Dakota pursuant to the Cheyenne River Oahe Act of 1954. (*See* Tr. Lawson, 1302:25–1304:4 (discussing Cheyenne River-Oahe Act ("Oahe Act"), Pub. L. 83-776, 68 Stat. 1191, § 4 (Sept. 3, 1954)). For several years, the Tribe and United States discussed relocation and whether the Building should sit completely on Government-owned land or tribal land, thereby held in trust by the United States. (PX 1820, PX 20, PX 69, JX 18). In 1957, the United States agreed with the Tribe that Building 2001 would be located on tribal lands in Eagle Butte, South Dakota. (PX 1476, PX 79, JX 30). Subsequently, the Tribal Council passed Resolution 23-57 which set aside tribal land in "Agency Reserve" for the purpose of reestablishing the Cheyenne River Agency. (JX 22). Resolution 23-57 also specified that the Tribe believed all buildings and facilities on the specified tract of land will revert to the Tribe when the United States no longer has need of it for Agency purposes. (*Id.*).

6

In 1959, the Army Corps of Engineers constructed the Building. (JSOF at ⁋ 11–12; JX 37–39). The Tribe's other expert historian, Mr. Donovin Sprague ("Mr. Sprague"),[14] testified that the Tribe expected Building 2001 to have equivalent facilities as the Old Agency Building. (Tr. Sprague, 1012:25–1014:2). However, the United States and the Court expressed concern regarding the foundation for Mr. Sprague's opinions, including whether the relevant documents were referenced in his expert report, (Tr. United States Counsel, 1016:8–16, 1023:21–25; Tr. Court, 1024:9–21), and whether his opinion was based on historical documents or "family stories[,]" (Tr. Sprague, 1038:18–1040:12).[15] Regarding the Tribe's expectations of the Building, Mr. Lawson also opined that the Tribe was concerned that the Building would fall into disrepair, but later walked backed that opinion as "more of a hypothetical" not rooted in historical records. (Tr. Lawson, 1353:18–1355:4).

Notably, during relocation, the United States did not construct all buildings specified in the Fort Laramie Treaty. (*Id.*, 1358:19–21; PX 1564 at art. 4 (requiring the United States to build a variety of facilities, including buildings for a blacksmith, miller, and a steam circular-saw mill, with a grist-mill and an attached shingle machine)). There are no buildings for a blacksmith or a miller, nor a sawmill on the reservation. (Tr. Lawson, 1358:19–21, 1360:13–15). Dr. Lawson explained that these changes arose because "federal services and staff evolve over time" and decisions to disregard those provisions of the Treaty were "mutual" between the United States and the Tribe. (*Id.*, 1358:19–22, 1360:12–19). However, Dr. Lawson later testified— inconsistently—that he was not aware of any instance where the Tribe waived any provision of the Fort Laramie Treaty. (*Id.*, 1366:7–10).

Following Building 2001's construction in 1959, the Tribe adopted Resolution 178-60 which requested the Secretary of Interior's formal approval for setting aside the designated tribal land under the Building; the Resolution noted that the land will be held in "Agency Reserve status" just like the Old Agency Building site. (JX 40). The Resolution also reiterated the reversionary language from Resolution 23-57, that the land will revert to tribal ownership once the United States no longer has need for Agency purposes. (*Id.*; JX 22). In 1960, the BIA Commissioner approved Resolution 178-60 and formally approved that the land was "designated as an administrative reserve." (JX 43). Although the BIA Commissioner did not explicitly

---

[14] Mr. Sprague qualified as an expert historian specializing in the Cheyenne River Sioux Tribe. (Tr. Sprague, 993:9–21). But throughout his testimony, it was unclear whether portions of his testimony were based on "common knowledge among the Tribe" or "family stories," raising credibility concerns for the Court. (*See* Tr. Sprague, 1002:5–9, 1038:18–1040:12). Although the Court acknowledges that historical experts routinely opine in tribal cases, *e.g., Pueblo of Jimenez v. United States*, 366 F. Supp. 3d 1234 (D.N.M. 2018) (discussing hearsay exception for general consensus within the community and relation to the use of Indian oral history), and the Tribe itself has a strong oral tradition, the Court will not rely on hearsay that is not the product of general consensus in the community. *Id.*; *see also* Fed. R. Evid. 803(20)). Here, the Court is skeptical because the Tribe failed to identify which opinions advanced by Mr. Sprague were derived from community consensus. (Tr. Sprague, 1038:18–1040:12).

[15] When faced with these concerns, the Tribe ended Mr. Sprague's testimony. (Tr. Tribe Counsel, 1044:17–1045:14).

address the Tribe's reversionary interest, the Tribe understood that it had a reversionary right in the land. (Tr. Lawson, 1318:12–16).

Throughout its use, the Building featured prominently in tribal life. The Tribe considered Building 2001 to be "the hub," akin to the Capitol of the United States where the Tribe conducted business. (Tr. Keckler, 340:1–2; Tr. White Feather, 1378:7–9). The Building even gave Tribal members the opportunity to "go down the hall" and "visit with [BIA] Superintendent Bourland if they wanted. His door was open." (Tr. Keckler, 342:2–4). But as Mr. Keckler powerfully explained, it was also "a community building for our people" where elders met to drink coffee and talk, people spoke their native language and laughed together, visited tribal officials, and attended Tribal Council meetings. (*Id.*, 339:20–342:17). This testimony was compelling.

Notwithstanding the vitality of the community inside, Building 2001 experienced decades of severe winter weather-induced damage. (*See id.*, 362:19–24, 424:19–23, 427:20). Specifically, the Building suffered from frequent leaks, attributed to its flat roof. (*Id.*, 242:2–11). Mr. Keckler explained that the Reservation experiences a significant amount of rain which sits on the flat root and in winter, that pooling water freezes, inhibiting proper draining. (*Id.*, 243:10–244:11). Since Building 2001's construction, BIA was responsible for and performed numerous repairs. (Tr. LaBeau, 89:25–90:3; Tr. LaPointe, 728:3–7). For example, BIA conducted annual roof repairs where known cracks were filled in with tar. (Tr. Bourland, 643:12–17). Further, between 1986 and 1988, the Building's roof—over both BIA North and Tribal South—was replaced; BIA alone bore the cost of replacement. (Tr. LaPointe, 740:2–10).

In the 2000s, BIA repeatedly sought to replace the roof but lacked funding. (*See id.*, 742:22–743:1). The roof's complex, three layered structure created roadblocks. (Tr. Bourland 587:6–23).[16] BIA, therefore, could not access the roof's superstructure without "taking everything off;" increasing roof replacement costs. (*Id.*, 588:9–10, 588:18–589:1). As time went on, the cost of repair/replacement increased: approximately $164,500 in 2001, (JX 102), $195,000 in 2003, (PX 149), approximately $443,433 in 2005, (JX 116), $336,416.26 in 2009 (only listing material costs), (JX 120), $500,056 in 2011, (PX 1027), and ultimately over $1,000,000 in 2015, (JX 198 (internal BIA email from Mr. Bourland to Mr. LaPointe)). Had the United States invested in the roof—which with hindsight were comparatively small sums to later estimates—Building 2001 would still be in service to the community of Eagle Butte and the people who relied on its centralized functions amidst a vast reservation.

In early 2012, there was heavy flooding. (Tr. LaBeau, 88:1–3; *see also* PX 1407). As a result, BIA staff again discussed "reroof[ing]" but there were again no funds available to pay the estimated $500,000 construction cost. (JX 128 (email chain from February 2012)). With limited repairs and a leaking roof, the Building and the Tribal Addition continued to deteriorate. (*See* Tr.

---

[16] The Court accepted Mr. Bourland's explanation of the roof structure because he was previously a carpenter and assisted the Tribal Addition's construction. (Tr. Bourland 625:3–18).

Keckler, 361:5–21).[17] For example, the Tribe kept its records in a basement vault in the Tribal Addition that flooded annually, resulting in mold damage to tribal records. (Tr. Clark, 497:8–18, 498:7–12 (testifying she did not permit her staff to access the records' vault because "it wasn't safe.")). Various tribal members experienced health issues, including runny noses and congestion, which they attributed to working in Building 2001. (Tr. LeBeau 141:15–142:17).

In January 2014, an inspection by an environmental specialist firm identified mold in Building 2001. (Tr. Keckler, 363:5–10; Tr. Bourland, 651:2–652:5). Badlands Environmental Consultants issued three environmental reports, collectively known as "the Badlands reports" which sampled different parts of the Building and Tribal Addition.[18] (JX 147 (first report, dated Jan. 16, 2014), JX 151 (first report's field survey results), JX 159 (second report, dated Jan. 21, 2014), JX 167 (third report, dated Jan. 27, 2014)). The first Badlands report stated that "mold/fungi is found everywhere throughout nature, air and swab samples[.]" (JX 147). It continued that the "presence of certain fungi in indoor environments is significant" because it can cause adverse health effects, including cold and flu symptoms, sore throat, headache, fatigue, and impaired or altered immune function. (*Id.*). Altogether, the Badlands reports identified six mold species, including Stachybotrys which is "extremely toxic" and grows in areas with at least fifty-five percent humidity and temperature fluctuations. (JX 159 at 3–4 (identifying six mold species); JX 147 at 3–4 (identifying four mold species); JX 167 at 4 (identifying one mold species)).

The Badlands reports also noted that the Building had visible water damage and multiple roof leaks, and the vents and HVAC ducts were filled with dust and dirt. (*E.g.*, JX 159 at 5). The Badlands reports recommended: eliminating moisture intrusion, abating water-damaged and mold-contaminated building materials, and cleaning and disinfecting or removing or replacing the HVAC systems. (JX 147 at 5; JX 159 at 5; JX 167 at 4–5). They were silent as to abandonment of the Building. (*See generally* JX 147; JX 159; JX 167). Critically, BIA implemented none of these recommendations, nor did BIA and tribal officials meet to discuss the recommendations or implementation. (Tr. Keckler, 327:15–329:4, 329:7–13).

At trial, the Tribe's mold expert, Mr. John Spilman ("Mr. Spilman")[19] agreed with the Badlands reports' recommendations regarding remediation of Building 2001, explaining that the mold "needs the moisture or the water" and without it, the mold dies. (Tr. Spilman, 908:24–909:3). He opined that the level of mold identified in the Badlands reports did not require abandonment of the Building. (*Id.*, 947:8–10 ("I can give the opinion that you don't—you could have absolutely saved the building")). This was not credible. Mr. Spilman conceded he had no

---

[17] The Tribe paid $46,071 to replace the Tribal Addition's leaking roof. (PX 1407 (work scheduled to be complete by September 26, 2013), PX 1441 (Tribal resolution authorizing replacement), PX 1406 (check to Chase Roof & Sheet Metal, dated Sept. 30, 2013)).

[18] The first two reports were addressed to Ms. Jeri Vines at the BIA Cheyenne River Agency. (JX 147; JX 159). The third report addressed to Mr. Keckler. (JX 167).

[19] Mr. Spilman was qualified as an expert in environmental engineering specializing in industrial hygiene. (Tr. Spilman, 875:6–24, 876:20–877:9, 878:3–10).

expertise about decisions to remediate versus abandoning a building or the cost analysis involved. (*Id.*, 947:11–15). Mr. Samuel Wilke ("Mr. Wilke"),[20] the Tribe's structural engineering expert, testified that "remediation was possible" and "abandonment was premature," (Tr. Wilke, 1085:6–18); though he acknowledged the Building required "substantial renovation and remodel" and did not discuss BIA's funding concerns. (*Id.*, 1092:19–1093:9 (listing replacement of mechanical and electrical systems, and "pretty much all building material inside that are non-structural.")).

Regarding the mold levels identified in the Badlands reports, Mr. Spilman testified that "the air was better than most for being with low concentrations of airborne mold spores" from air samples collected throughout the Building. (Tr. Spilman, 916:24–917:3). Mr. Spilman clarified that he compared results from all three Badlands reports to the National Allergy Bureau Guideline for Relative Exposures to Outdoor Air Pollen and Spores ("Allergy Bureau Guideline"), which he considered the industry standard. (*Id.*, 917:4–17, 930:12–931:6). However, Mr. Spilman was confused when the Court pointed out that the document advancing the Allergy Bureau Guideline also explicitly stated "there were no standards" for interpreting pollen or spore counts for effect on human health. (*Id.*, 959:6–960:24). Mr. Spilman could not explain the discrepancy between his testimony and the document he relied upon to form that opinion. (*Id.*, 960:2–6 ("But how can they say there's no standard? . . . So air samples are just for what?")). This unfamiliarity with documentation he relied upon in formulating his opinions also adversely affected his credibility.

On January 21, 2014—the same day as the second Badlands report—BIA shut down its headquarters in the Building. (JX 169 ("The Agency Headquarters operation was shut [ ] down effective Tuesday, January 21, 2014, with all entrances to the Agency area of the building secured.")). Consequently, on Friday, January 31, 2014, Mr. Timothy LaPointe, notified Chairman Keckler that BIA was coordinating an "emergency move" from Building 2001 because the presence of microbial/fungi could cause serious health concerns. (*Id.*). Mr. LaPointe also highlighted the Badlands report results in the tribally occupied portions of the Building that demonstrated "air quality similar to or worse than the testing results in the Agency portion of Building 2001." (*Id.*). Accordingly, Mr. LaPointe concluded the air quality testing was sufficient to end all occupancy of the Building and expressed an understanding the Tribe planned to vacate it. (*Id.*).[21]

---

[20] Mr. Wilke was qualified as an expert in a structural, civil engineering. (Tr. Wilke 1046:14–15, 1046:23–1047:2). He was permitted to testify about the Badlands reports only to the extent that he relied on such information in his capacity as a civil engineer. (Tr. Court, 1084:20–23).

[21] Mr. LaPointe further stated the Tribe did not have a current lease or permit with a legal right to occupancy. (JX 169). At the inception of the Building's co-occupancy, the Tribe and the United States executed a "use permit" to grant the Tribe permission to use Tribal South. (JX 41; JX 42). In 1971, the parties executed another use permit. (JX 50). For reasons unknown to the parties and the Court, BIA and the Tribe failed to execute additional use permits once the second permit

The very next day, the Tribe gathered what it could and vacated the Building with one exception: Chairman Keckler continued using his office in Tribal South until the end of November 2014. (JSOF at ¶ 27; Tr. Clark, 485:2–8, 500:10–25; Tr. Keckler, 336:9–16). While Mr. Keckler remained in his office, BIA determined that the cost of remediation, water damage restoration, and roof replacement exceeded the value of the Building, (JX 181 (April 2014 email from BIA environmental engineer, Mr. Gordon Rosby); Tr. LaPointe, 742:15–19); Mr. LaPointe conceded BIA did not get an appraisal of the Building, (Tr. LaPointe, 761:23–25). Similarly, BIA believed that Building 2001 had "exceeded" its fifty-year lifespan. (*Id.*, 761:11–14). LaPointe further testified that the collective information he had at the time—the cost estimates, the Badlands reports, and the Building's age and condition—led to BIA's conclusion that it was "not feasible to restore this building." (*Id.*, 760:23–761:1 ("And the knowledge of the status of the [B]uilding at that time with the mold in the [B]uilding. So it wasn't just this email, it was all the collective information that I had at the time."); JX 181). Ultimately, as Mr. LaPointe succinctly stated, "the cost of repair exceeded the worth of the [B]uilding." (Tr. LaPointe 741:17–19).

In July 2015, the Tribe approached Superintendent Bourland about gaining access to the Tribal Addition; notably, Superintendent Bourland emailed BIA staff that he was "not sure why" the Tribe sought his permission to enter the Tribal Addition because the Tribe "ha[s] every right to go into their own building[.]" (JX 200). At no point did BIA take the Tribe's keys to Tribal South or the Tribal Addition; nor did BIA change the locks or physically bar the Tribe from accessing the Tribal Addition. (Tr. Keckler 381:6–382:15).[22]

Nonetheless, the evacuation of the Building scattered tribal government and administrative services, exacerbating daily tribal life and governance. (*Id.*, 337:9–18, 342:1–348:1). For example, the Chairman's office, Tribal Secretary's office, legal department, and administrator's offices were moved to a former girls' dormitory provided by the United States. (Tr. LaBeau, 95:20–97:2; Tr. Keckler, 337:20–15). BIA and the Tribal Enrollment Office were relocated to the Western Sky building; some council offices resettled at the culture preservation building on the other side of Eagle Butte; and other offices, such as the payroll department and loan office, moved to the Wellness Center. (Tr. LaBeau 97:2–22, 102:12–25; JX 170). The Tribe's council chambers were moved to a conference room at the Cheyenne River Motel. (Tr.

---

expired in 1976. (Def.'s Mot. for Summ. J. at 17). The lack of a permit or lease was not fatal to the Tribe's occupancy of the Building as they remained in Tribal South until 2014. (JX 169; Tr. Bourland, 526:3–7). At trial, both parties failed to produce an executed lease or permit for tribal occupancy of Building 2001 past 1976. (Tr. Bourland, 526:8–12, 533:12–15). Thus, the Court will not consider the Tribe's lack of lease or permits.

[22] During the Court's July 27, 2023, site visit, signs stating, "[n]o soliciting, loitering, trespassing," and "danger – keep out," as well as chains and padlocks, were discovered on the entrances to the Building. (*See* Notice, ECF No. 105; PX 1831). Upon closer inspection, the entrance to the Tribal Addition did not have chains nor did it appear locked. (PX 1831 at 5). Thus, the Court will not consider the impact of the signs or locks on the door to the Tribal Addition.

LaBeau, 104:7–11). These relocations became permanent. (JX 181; Tr. LaPointe, 742:15–19; JX196; Tr. LaBeau, 95:20–97:2, 97:2–22, 102:12–25; Tr. Keckler, 337:20–15).

In the spring of 2015, BIA discussed demolishing Building 2001. (JX 200; JX 203). Demolition did not occur; BIA again lacked funding to cover the approximately $1,000,000 estimate. (*See* JSOF at ¶ 14; Tr. Bourland, 694:8–11, 776:2–778:18). At trial, Mr. Wilke, the Tribe's structural engineering expert, challenged BIA's estimated cost. (JX 210 (Mr. Wilke's expert report, including Appendix A – Estimate of Probable Costs)). Specifically, Mr. Wilke estimated it would cost $225,000 for complete building remediation of hazardous material and only $227,325 for complete demolition, nearly half the cost of BIA's estimates. (*Compare* JX 210 at 19, *with* Tr. Bourland, 694:8–11). Notably, Mr. Wilke's estimates refer to the entire Building—BIA North, Tribal South, *and* the Tribal Addition—not only the portions owned by the United States. (Tr. Wilke, 1059:25–1060:5).

Mr. Wilke noted the land underneath the Building was "still usable" but did not expand on this opinion nor did the Tribe advance any expert testimony as to the value of that land, an inexplicable failure of proof. (*Id.*, 1071:13–17; *see generally* Trial Tr.). Rather, Mr. Wilke advanced an opinion that it would cost $12,883,500 to remediate, demolish, and construct a new building to house both BIA and the Tribe on the same site, costing approximately $900 per square foot. (Tr. Wilke, 1059:1–17, 1061:6–14 (discussing Appendix A in JX 210), 1096:16–25; DX 403).[23] However, Mr. Wilke admitted his construction costs were from the Cummings construction cost data for skyscrapers within the city limits of Chicago, Illinois in 2021. (Tr. Wilke, 1170:5–1173:23).

As result of a particularly effective cross-examination, Mr. Wilkie conceded that he committed the following errors related to his construction cost analysis: (1) factored in inflation from 2021 when the Cummings data was published but failed to record that in his report, (*id.*, 1169:10–21); (2) failed to provide calculations demonstrating how he arrived at his $900 per square foot estimate, (*id.*, 1169:22–24); (3) failed to use any data nor attempt to find construction cost data from 2014, (*id.*, 1169:25–1170:4); (4) failed to adjust for post-COVID inflation/increased costs of construction in 2021, (*id.*, 1170:5–13); (5) failed to identify any local construction cost data from Eagle Butte, South Dakota, (*id.*, 1170:14–22); (6) failed to adjust for potential cost differences between projects within the city limits in Chicago, Illinois and Eagle Butte, South Dakota, (*id.*, 1170:23–1175:7 (admitting that the Cummings data specifies projects outside city limits of Chicago, Illinois might cost less); DX 403); (7) failed to rely on the seemingly applicable "Commercial/Office, Single Story" category—ranging from $332 to $399 per square foot—but rather used "Public/Community Facilities, Government Administration Buildings" category—ranging from $634 to $767 per square foot, (Tr. Wilke, 1175:21–1176:16);

---

[23] On direct, Mr. Wilke unconvincingly testified that his cost estimates derived from construction and renovation work in Indian country; this is unique because of logistical and bureaucratic hurdles, including remote locations and "[Tribal Employment Rights Office ("TERO")] fees and tax" placing excise taxes and extra surcharges when non-Indian workers are used for projects on a reservation. (Tr. Wilke, 1065:23–1066:7, 1097:2–16 (relying on prior experience constructing a detention center for the Sisseton Wahpeton Oyate tribe in Belcourt, North Dakota)). This explanation is unsatisfactory.

and (8) failed to explain why his estimated construction costs exceeded Chicago, Illinois construction costs by at least $233 per square foot, (*id.*, 1176:22–1177:15). An adequate explanation for deriving cost data from Chicago, Illinois, a major metropolitan area that could not be more different from a rural South Dakota community and over 800 miles away, remains unknown.

In another effort to provide a valuation for Building 2001, Mr. Wilke testified to Building 2001's rental value if it was habitable and in good repair. (*Id.*, 1100:18–23 (identified as "Opinion 11")).[24] Mr. Wilke searched rental rates of "comparable" properties in Rapid City, South Dakota on a website called "loopnet.com" which only listed advertised lease amounts, not amounts from signed leases. (*Id.*, 1104:21–1105:17, 1107:2–1108:18 (specifying "comparable" as similar occupancy usage, materials and type of construction, and location), 1182:20–1184:10). Mr. Wilke also conceded numerous errors related to his rental value analysis, (*Id.*, 1184:7–1182:7),[25] and again, failed to offer a credible valuation. Despite the Court's expectations prior to trial, the Tribe failed to provide any evidence as to the value of the land underneath the

---

[24] The United States opposed this testimony in motions in limine, arguing that Mr. Wilke's opinion does not satisfy Fed. R. Evid. 702 ("FRE") because (1) the "Rental Cost (Annual Lease)" of office space in 2023 in Rapid City is not a fact before the Court; (2) Mr. Wilke is not qualified to offer an expert opinion on the fair market value of real estate because he is not a licensed appraiser; (3) Mr. Wilke did not base his opinion on "sufficient facts or data[;]" (4) the opinion itself is not the "product of reliable principles and methods[;]" and (5) Mr. Wilke applies no reliable principles or methods to the facts of this case. (Def.'s Mot. in Lim., ECF No. 139; Def.'s Mot. in Lim Mem. at 14–18, ECF No. 140). The Court denied the United States' motion regarding Opinion 11 and instructed the United States to raise their objections through contemporaneous objections at trial. (Mot. in Lim. Order, ECF No. 155). The United States objected throughout trial to Mr. Wilke's Opinion 11 testimony. (*E.g.,* Tr. United States Counsel, 1101:3–4, 1115:14–18). With reservation, the Court permitted Mr. Wilke to proceed with testimony regarding lease values and rental rates. (Tr. Court, 1101:5–14, 1115:19–1116:8). That was the Court's error. Mr. Wilke relied on his experience as a managing partner in his engineering firm involved in the firm's own lease terms and conditions and contracts for its offices. (Tr. Wilke, 1101:16–22). Mr. Wilke conceded he has never been a licensed appraiser, has no familiarity with the methodology or standards appraisers use to determine rental values, and is unfamiliar with the "Uniform Standards of Professional Appraisal Practice." (*Id.*, 1181:3–1182:7). With hindsight, the Court acknowledges Mr. Wilke should not have testified on this issue; he lacks sufficient expertise to opine on this topic and does not satisfy FRE 702 requirements. Frankly, no "expertise" was necessary to conduct the internet search performed by this witness, any individual could have done so.

[25] Mr. Wilke conceded the following errors in his rental value analysis: (1) relying on advertised leases that were either $14 or $16 per square foot but only using $16 in his valuation, (Tr. Wilke, 1184:7–20); (2) failing to explain why he used the increased value per square foot, (*id.*, 1184:21–23); (3) solely relying on properties in Rapid City, South Dakota despite its differences to Eagle Butte, including Rapid City's increased physical size, higher population and foot traffic, airport, more industries, and higher income levels, (*id.*, 1184:24–1186:7).

Building. (*See generally* Trial Tr.). For valuation, the Tribe solely relied on Mr. Wilke's questionable construction cost analysis and rental property testimony. The Court credits neither his methodology nor his opinions.

As of May 2024, BIA still lacks funding for the Building's restoration or demolition and cannot provide a clear answer as to when that funding will, if ever, be available. (Tr. LaPointe, 835:19–837:23). There is no BIA plan to remediate, repair, or even demolish Building 2001. (Tr. Bourland, 700:25–701:3). There is no BIA plan to consolidate BIA and tribal offices in one building. (*Id.*). The situation remains stagnant. The tribal government remains scattered, the centralized community space where elders gathered may be irretrievable, and tribal members are forced to travel to multiple locations to conduct business with their leaders. Today, the Building sits vacant and inaccessible, a rotten hulk, continuing to decay, unsightly and unsafe—on unvalued land—on Main Street in Eagle Butte, South Dakota. (PX 1831).

### III.   Conclusions of Law[26]

#### A.   The Tribe failed to prove that the United States breached any trust obligations.

The Tribe is tasked with identifying language that expressly obligated the United States to maintain, protect, repair, and preserve the Building. *Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023) ("*Navajo Nation*"). At trial, the Tribe attempted to reframe the United States' responsibility to construct an agency building on the reservation as evidence of continuing obligations for the maintenance, protection, repairs, and preservation of Building 2001. However, the Tribe failed to meet its burden and show the United States' responsibility to construct established a trust asset or duty to maintain.

It is well-settled that a trust relationship between the United States and an Indian tribe has three essential elements: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus. *United States v. Mitchell*, 463 U.S. 206, 216–17, 219, 225 (1983) (quoting *Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171 (1980)). The United States assumes trust obligations to Indians "only to the extent it expressly accepts those responsibilities" in an underlying source of law. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). In *Navajo Nation*, the Supreme Court specified that to succeed on a breach of trust claim, the tribe must establish that "the text of a treaty, statute, or regulation imposed certain duties on the United States." 599 U.S. at 563 (collecting cases). Critically, federal courts are bound to the text of the relevant law. *Id.* at 564.

"Indian treaties cannot be rewritten or expanded beyond their clear terms." *Id.* at 565 (quoting *Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943)). Therefore, the Court cannot apply common law trust principles that exceed the text of the underlying source law. *Id.* at 566. "Congress may style its relations with the Indians a trust without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is limited or bare compared to a trust relationship between private parties at common law." *Jicarilla Apache Nation*, 564 U.S.

---

[26] The Court will include additional findings of fact as necessary for the conclusions reached below.

at 177. Subsequently, common law trust principles only apply if the underlying source of law establishes a conventional trust relationship between the United States and the tribe. *Navajo Nation* 599 U.S. at 565–66. "[M]odern policy priorities and needs" can only be updated through an act of Congress or by the President. *Id.* at 566. Put plainly, the United States' trust duties to an Indian tribe are limited only to the express responsibility found in the relevant treaty, statute, or regulation. *See id.* at 565–66.

At summary judgment, the Court viewed language in the relevant sources of law—the Fort Laramie Treaty and Oahe Act—"in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). Accordingly, the Court held the treaty and statutory language, along with the United States' recognition of an obligation to reconstruct an agency, could indicate a trust responsibility between the Tribe and the United States. (Summ. J. Op. at 6, 10–11). However, at trial, the Tribe failed to show a trust duty that could be traced to either text. Rather, the Tribe unconvincingly tried to weave together disjointed treaty and statutory language as well as offer unsupported tribal interpretations of that language. (*See, e.g.,* Tr. Tribe Counsel, 13:10–14:8).

The Fort Laramie Treaty requires the United States "at its own proper expense to construct," "an agency building for the residence of the agent, to cost not exceeding three thousand dollars[.]" (PX 1564 at art. 4). The Treaty also provides that the United States' agent "shall in the future make his home at the agency building," and that the agent "shall reside among," the Tribe to "keep an office open at all times for the purpose of prompt and diligent inquiry," into the Tribe's affairs. (*Id.* at art. 5). Dr. Lawson opined that the Tribe understood this language and the original building's placement on tribal land to mean "it would always be located on the reservation." (Tr. Lawson, 1316:4–12); though notably, this opinion was untethered to contemporaneous tribal understandings of the Fort Laramie Treaty. (*Id.*, 1316:13–22 (relying on relocation documents from the 1950s)). As discussed above, the use of a historian after the Tribe abandoned reliance on an oral history in favor of a written record is unavailing. (*See* PX 1811; *see also* Tr. White Feather, 1374:22–1375:7 (explaining existence of council meeting minutes since implementation of tribal constitution)). Upon review of the evidence and case law, the Court cannot accept this flexible interpretation of the Treaty language.

In its plainest terms, the Treaty expressly imposes a duty to "construct" an agency building on the reservation and for the agent to "make his home at the agency building." (PX 1564 at art. 4–5). The Court cannot expand the United States' obligations beyond those express terms. *Choctaw Nation*, 318 U.S. at 432. The parties agree that the United States satisfied its duty to "construct" an agency building. (JSOF at ¶ 11–12). However, because this issue is not squarely presented here, the Court declines to interpret the "make his home" and "keep an office open at all times" provisions to attach an affirmative duty to always have and maintain an agency building for that specific purpose on tribal land. (PX 1564 at art. 4–5; *Navajo Nation* 599 U.S. at 565–66. Such an interpretation would violate the stark precedent of *Navajo Nation*. 599 U.S. at 563–66. Despite the Court's reservations about the implications for the Tribe, the Fort Laramie Treaty is silent as to whether the building itself is a trust asset or creates ongoing trust duties. (*Id.*). At trial, the Tribe failed to credibly identify any records that support its more generous reading of the Treaty. (*E.g.,* Tr. Sprague, 978:18–979:15 (cursory discussion about the Treaty)).

Similarly, the Tribe failed to establish that the Oahe Act contemplated the future of Building 2001. Under the express language of section 4, the United States was required to expend "further appropriations" for the "relocation and reconstruction of Cheyenne River Agency" in the 1950s. Oahe Act at § 4. Section 4 contained no express language about maintenance or preservation beyond that relocation to Eagle Butte, South Dakota. *Id.*; *Navajo Nation*, 599 U.S. at 565 (finding United States with no obligation when "the treaty said nothing about any affirmative duty for the United States to secure water."). Critically, only section 4 of the Oahe Act expressly discussed the agency building. *See generally* Oahe Act. Nonetheless, the Tribe tethered its argument to section 5 of the Oahe Act, arguing it imposed a duty to maintain. (Tr. Tribe Counsel, 13:10–14:8).

Section 5 mandated that the United States appropriate $5,160,000 for the "complete rehabilitation for all members" of the Tribe and that the funding be used "to the extent that the economic, social, religious, and community life of all said Indians shall be restored *to a condition not less advantageous*" to the Indians' present condition (in 1954). Oahe Act at § 5 (emphasis added). Although the Court heard moving testimony about the role Building 2001 had in the Tribe's community and social life, (Tr. Keckler, 339:20–342:17), that was not contemplated by the express language or structure of the Oahe Act. *See* Oahe Act at §§ 4–5. Congress placed language about the Building in one section, and language about community life in another. *Id.* At trial, the Tribe dismissed the importance of two, distinct sections of the Oahe Act, instead arguing the Tribe understood the "not less advantageous" relocation language to apply to facilities for the Tribe. (Tr. Lawson, 1307:21–24, 1330:18–23). But this opinion fails to engage with the substance and structure of the statute as required by law. *Jicarilla Apache Nation*, 564 U.S. at 177. Further, the Court does not credit portions of Mr. Sprague's testimony regarding equivalent facilities after relocation, (Tr. Sprague, 1012:25–1014:2, 1038:18–1040:12), because the Tribe was unable to distinguish whether specific opinions derived from "family stories" rather than common knowledge among the Tribe and thus were hearsay. Moreover, as noted above, the Tribe formally adopted written record practices in 1935 so Mr. Sprague's opinions were redundant.

If the Court were to adopt the Tribe's understanding of the Oahe Act, it would contravene the Act's express language and structure. Oahe Act at §§ 4–5; *Jicarilla Apache Nation*, 564 U.S. at 177. Based on its understanding of the Fort Laramie Treaty and Oahe Act, the Court cannot identify Building 2001 as a trust asset or that the United States expressly accepted a duty to maintain and preserve it. Regardless, as discussed below, a failure to produce a preponderance of credible evidence regarding damages precludes recovery.

Because the Tribe failed to identify any specific trust-creating language in the Treaty or Oahe Act that the United States violated, the Court cannot reach the question of whether the trust duty was money mandating. *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009). But even if the Tribe established the Building as a trust asset and that the United States breached an obligation to maintain it, the Tribe failed to offer any credible testimony on how to calculate damages. As discussed above, only Mr. Wilke—an expert who lacked credibility and admitted to countless errors in his expert report—produced inflated valuation calculations. (Tr. Wilke, 1169:10–1177:15 (discussing eight significant errors in construction analysis), 1059:25–1060:5 (admitting analyzed the Building and Tribal Addition altogether), 1184:7–1182:7 (conceding valued the Building as if it were habitable and in good repair)). Despite the Court's sympathy for

Case 1:20-cv-00126-DAT   Document 183   Filed 08/14/24   Page 17 of 19

the Tribe's suffering, the Supreme Court was clear that the United States owes an Indian tribe trust obligations "only to the extent it expressly accepts those responsibilities" in an underlying source of law. *Jicarilla Apache Nation*, 564 U.S. at 177. Accordingly, the Tribe's assertions of statutory obligations to hold the Building in trust and maintain the Building are untethered from treaty and statutory language; the Tribe failed to carry its burden of proof as plaintiff.

> B. *The Tribe failed to prove the Building's deterioration constituted a Fifth Amendment takings.*

To demonstrate liability as to its takings claim, the Tribe needed to offer evidence that the land underneath the Building and the tribally-owned Tribal Addition—where the Tribe indisputably has cognizable property interests—were taken by the United States. The Tribe failed to do so; the Tribe also failed to provide any basis for monetary relief even if a taking occurred.

Under the Fifth Amendment, the United States is required to provide "just compensation" for taking private property. U.S. Const. amend. V. The Court applies a two-part analysis to assess the validity of takings claims, determining (1) whether the claimant has identified a "cognizable Fifth Amendment property interest," and (2) whether that property interest was "taken." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) (citations omitted). The Court will not proceed to the second step "without first identifying a cognizable property interest." *Id.* (quoting *Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005)). A cognizable property interest is typically indicated by the ability to sell, assign, transfer, or exclude. *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012); (JSOF at ¶ 14, 18–19).

As an initial matter, Building 2001 is federal property and the Tribe recognized BIA's control over it. (Tr. United States Counsel, 16:2–5; Tr. Clark, 485:2–8 (describing compliance with BIA's Jan. 31, 2024 vacation order)). At trial, the Tribe briefly attempted to show a reversionary right in the Building. (*E.g.,* Tr. Lawson, 1318:3–16 ("the [T]ribe understood that it had a reversionary right.")).[27] However, the Tribe failed to produce any supporting evidence of a future property interest in the Building itself. (Tr. Court, 1044:5–16 ("And if you've got records, historical records which will support [this] position, and there -- there may very well be, but I've not heard anything which convinces me at this point that there is something which supports the conclusion that we -- other than the statutes themselves, we were going to get those buildings if the -- when the federal government was done with them. Not a thing.")). Conversely, both parties agree that the Tribe has a cognizable property interest in the Tribal Addition and the land underneath the Building. (JSOF at ¶ 14, 18–19); *Hearts Bluff Game Ranch, Inc.*, 669 F.3d at 1330. Therefore, the Court may proceed to the question of whether the Tribe's property interest

---

[27] Notably, at summary judgment, the Court expected the Tribe to explain at trial how its right to salvage materials from the Old Agency Building under section 7 of the Oahe Act would relate to its future interest in Building 2001. (Summ. J. Op. at 13). It failed to do so. (*See generally* Trial Tr.). When asked whether the Tribe wanted to retain its rights to the building and its materials once they were unnecessary to the United States, Dr. Lawson responded in the negative. (Tr. Lawson, 1321:7–23).

17

in the Tribal Addition or land underneath Building 2001 was "taken." *Acceptance Ins. Cos., Inc.*, 583 F.3d at 854.

At summary judgment, the Court had concerns about whether BIA's decision to not repair or remediate the Building constituted government inaction as defined in *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1361 (Fed. Cir. 2018). There, the Federal Circuit held that "[o]n a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government." *Id.* at 1360. The Federal Circuit continued that "takings liability must be premised on affirmative government acts . . . the failure of the government to properly maintain [government property] or to modify the [property] cannot be the basis of takings liability. Plaintiffs' sole remedy for these inactions, if any, lies in tort." *Id.* at 1362. At trial, the Court learned that BIA did not act to repair the roof solely because it lacked funding. (Tr. LaPointe, 742:22–743:1). This failure to repair the roof is distinguishable—as discussed at summary judgment—from BIA's decision to cease all maintenance and repairs. (Summ. J. Op. at 15 (discussing applicability of *St. Bernard Parish Gov't*, 887 F.3d at 1360)). At trial, the Court also discovered why BIA made that decision: "there's documentation to show that the cost of repair exceeded the worth of the building." (Tr. LaPointe 741:17–19). Therefore, the government action at issue here is the decision to stop all maintenance and repairs of Building 2001, and ultimately slot it for demolition.

The Fifth Amendment provides for a distinction between a physical taking and a regulatory taking. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 US. 302, 321 (2002). A physical taking occurs when government action physically occupies or invades property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). A regulatory taking occurs "when government actions do not encroach upon or occupy the property yet still affect and limit its use to such an extent that a taking occurs." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), *overruled on other grounds by Knick v. Twp. of Scott, Pa.*, 588 U.S. 180 (2019). Here, the Tribe's theory that the cessation of all building maintenance satisfies neither taking category for either the Tribal Addition or the land underneath the Building. *See id.*; *see also Loretto*, 458 U.S. at 435.

Regarding the Tribal Addition, Mr. Bourland credibly testified that it is self-contained and functionally separate from Building 2001. (Tr. Bourland, 587:20–23, 624:10–16). The Tribal Addition was not in pristine condition and was attached to a deteriorating building; it experienced the same harsh winters and had a leaking roof and a mold problem. (PX 1407 (roof replacement work order), PX 1441 (tribal resolution authorizing roof replacement), PX 1406 (roof replacement check); JX 147 (first Badlands report); JX 159 (second Badlands report), JX 167 (third Badlands report)). It was the Tribe's own concerns about mold that led to vacation of the Tribal Addition, exemplified by tribal officers like Ms. Clark expressing concerns about the records vault, where the BIA exerted no ownership rights. (Tr. Clark, 497:8–18, 498:7–12). Such concerns related to the mold identified in the Building *and* Tribal Addition. (Tr. LaBeau, 141:15–142:17 (attributing building conditions to runny nose and congestion problems)).

The Tribe failed to prove that the United States's decision to end all maintenance and demolish the Building interfered with the Tribe's use of the Tribal Addition. For example, there is evidence that the Tribe postured—in communications with Superintendent Bourland—that BIA blocked its access to the Tribal Addition. (JX 200). But BIA clearly stated it was not

blocking access and did not understand why the Tribe sought access to its own Building. (*Id.*); *compare Loretto*, 458 U.S. at 435. Further, the Tribe failed to provide any evidence that BIA physically prevented or passed a regulation preventing the Tribe from accessing the Tribal Addition once the Building was vacated, or even barring them from Tribal South. (Tr. Keckler 381:6–382:15; JX 200). Thus, the Tribe fails to demonstrate the Tribal Addition was "taken." *Acceptance Ins. Cos., Inc.*, 583 F.3d at 854.

Regarding the land underneath the Building, the Tribe failed to discuss it at trial beyond its status as a trust asset. (*E.g.,* Tr. LaPointe 833:10–16 ("the land is a trust asset."); *see generally* Trial Tr.). It is undisputed that the land beneath the Building is held in trust by the United States for the benefit of the Tribe. (JSOF at ¶ 14). It follows that the land is held in trust because it is the site of Building 2001. (*See id.* at ¶ 12, 14). Despite its abandonment and no current demolition plan, the Building still sits on that land. (Tr. LaPointe, 835:19–837:23; Tr. Bourland, 700:25–701:3). Accordingly, the Tribe's property interest in the land as a trust asset has not yet been physically "taken." *Loretto*, 458 U.S. at 435. The Tribe's property interest in the land has also not yet been regulatorily "taken" because the Tribe's use has not yet been "limited." *Palazzolo*, 533 U.S. at 617. A taking may occur if Building 2001 is demolished and the United States does not relinquish control of the land, but that has not occurred here. Therefore, there has been no taking.

Even if a taking occurred, the Tribe offered no evidence—either documentary or testimonial—which could form a basis for any valuation of the Tribal Addition or the land underneath Building 2001. Put simply, the Tribe has the burden of proving damages and it failed to do so. *E.g., Agapion v. United States*, 167 Fed. Cl. 761, 772 (2023) ("If a plaintiff has not provided evidence sufficient to determine just compensation, the Court is not obligated to fashion its own award.") (quoting *Gasden Industrial Park, LLC v. United States*, 956 F.3d 1362, 1371 (Fed. Cir. 2020)) (internal quotation marks omitted). As discussed repeatedly above, the Tribe failed to provide any credible valuation for the Court. Therefore, the Court cannot award damages.

## IV.    Decision and Order of Judgment

The Court finds and concludes that the Tribe failed to carry its burden as plaintiff for the breach of trust claim and Fifth Amendment takings claim. Pursuant to RCFC 58, the Clerk is **DIRECTED** to enter final judgment in favor of the United States.

**IT IS SO ORDERED.**



s/   David A. Tapp
DAVID A. TAPP, Judge